IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTICT OF WEST VIRGINIA
AT CLARKSBURG

WEST VIRGINIA HIGHLANDS
CONSERVANCY, OHIO VALLEY
ENVIRONMENTAL COALITION
and SIERRA CLUB,

          Plaintiffs,

v.                                              CIVIL ACTION NO. 1:19-CV-149 (Kleeh)

DANA MINING COMPANY, LLC,

          Defendant.

ELECTRONICALLY FILED
Aug 06 2019
U.S. DISTRICT COURT
Northern District of WV

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This is a citizen suit for declaratory and injunctive relief against Defendant Dana Mining Company, LLC ("Dana") for violating the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (herafter the Clean Water Act ("CWA")), and the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1201 et seq. (hereafter "SMCRA") at its Prime #1 Deep Mine in Monongalia County, West Virginia.

2. As detailed below, Plaintiffs allege that Dana has discharged and continues to discharge pollutants into waters of the United States in violation of Sections 301 of the CWA, 33 U.S.C. § 1311, and the conditions and limitations of its West Virginia/National Pollution Discharge Elimination System ("WV/NPDES") Permit No. WV1011715.

3. Plaintiffs further allege that Dana's discharges of pollutants into waters adjacent to the Prime #1 Deep Mine violate the performance standards under SMCRA and the terms and conditions of West Virginia Surface Coal Mining and Reclamation ("WVSCMRA") permit U025100.

1

## JURISDICTION AND VENUE

4. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question, 33 U.S.C. § 1365 (CWA's citizen suit provision), and, 30 U.S.C. § 1270 (SMCRA citizen's suit provision).

5. On June 4, 2019, Plaintiffs gave notice of the violations and their intent to file suit to the Defendant, the United States Environmental Protection Agency ("EPA"), the Office of Surface Mining Reclamation and Enforcement ("OSMRE"), and the West Virginia Department of Environmental Protection ("WVDEP") as required by Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and Section 520(b)(1)(A) of SMCRA, 30 U.S.C. § 1270(b)(1)(A).

6. More than sixty days have passed since the notice was sent. EPA, OSMRE, and/or WVDEP have not commenced or diligently prosecuted a civil of criminal action to redress the violations. Moreover, neither EPA nor WVDEP commenced an administrative penalty action under Section 309(g) of the CWA, 33 U.S.C. § 1319(g), or a comparable state law to redress the violation prior to the issuance of the June 4, 2019 notice letter.

7. Venue in this District is proper pursuant to 33 U.S.C. § 1365(c)(1) because the sources of the CWA violations are located in this District, and pursuant to 30 U.S.C. § 1270(c) because the coal mining operations complained of are located in this District.

## PARTIES

8. Dana is a West Virginia Limited Liability Company engaged in the business of mining coal.

9. Dana is a person within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5), and Section 701(19) of SMCRA, 30 U.S.C. § 1291(19).

10. Plaintiff Ohio Valley Environmental Coalition is a nonprofit organization incorporated in Ohio. Its principal place of business is in Huntington, West Virginia. It has approximately 400 members. Its mission is to organize and maintain a diverse grassroots organization dedicated to the improvement and preservation of the environment through education, grassroots organizing, coalition building, leadership development, and media outreach. The Coalition has focused on water quality issues and is a leading source of information about water pollution in West Virginia.

11. The West Virginia Highlands Conservancy is a nonprofit organization incorporated in West Virginia in 1967. Its volunteer board of directors and approximately 1,500 members work for the conservation and wise management of West Virginia's natural resources. As one of West Virgin's oldest environmental activist organizations, the West Virginia Highlands Conservancy is dedicated to protecting clean air, clean water, forests, streams, mountains, and the health and welfare of the people that live in the Mountain State and for those who visit to recreate.

12. Plaintiff Sierra Club is a nonprofit corporation incorporated in California, with more than 768,000 member and supporters nationwide, including approximately 2,600 members who reside in West Virginia and belong to its West Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and the human environment; and to using all lawful means to carrying out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment and protection of surface water in West Virginia.

13. Plaintiffs have members who use, enjoy, and benefit from the water quality in Robinson Run, its tributaries and associated natural resources. They would like to recreate in the areas downstream from Dana's operations, but excessive amounts of pollutants harmful to the aquatic ecosystem make the water aesthetically unpleasant and environmentally undesirable. These same pollutants are discharged in significant quantities from Dana's Prime #1 Deep Mine into Robinson Run. Robinson Run is severely biologically impaired and pollution makes it impossible for a healthy aquatic ecosystem to survive. As a result, the environmental, aesthetic, and recreational interests of Plaintiffs' members is affected by the discharges of Dana's discharges of pollutants into Robinson Run.

14. One such member is John Wood. He has been visiting Robinson Run since 1991. He found the stream while driving backroads near his home and now visits regularly on route to Pennsylvania. He is bothered by the obvious impacts to the stream—in the form of orange staining from acid mine drainage. He is even more concerned, however, by the less visually obvious impacts from ionic pollutants. He fears that the activities of the Defendant is killing the wildlife in Robinson Run through its discharges. He will continue to visit Robinson Run, but would enjoy his visits, and the stream much more if he knew that Dana was not actively degrading the stream.

15. If Dana's unlawful discharges ceased, the harm to the interest of Plaintiffs' members would be redressed. An injunction would redress Plaintiffs' members injuries by preventing further violations of the limits in Dana's permits.

16. At all relevant times, Plaintiffs were and are "persons" as that term is defined by the CWA, 33 U.S.C. § 1362(5) and SMCRA, 30 U.S.C. § 1291(19).

**STATUTORY AND REGULATORY FRAMEWORK**

17. Section 301 of the CWA 33 U.S.C. § 1311(a) prohibits the "discharge of any pollutant by any person" into waters of the United States except in compliance with the terms of a permit, such as a NPDES permit issued by EPA or an authorized state pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

18. Section 402(a) of the CWA, 33 U.S.C. § 1342(a) provides that the permit-issuing authority may issue a NPDES Permit that authorizes the discharge of pollutants directly into waters of the United States, upon the condition that such discharge will meet all applicable requirements of the CWA and other such conditions as the permitting authority determines necessary to carry out the provisions of the CWA.

19. Section 303(a) of the CWA, 33 U.S.C. § 1313(a) requires that states adopt ambient water quality standards and establish water quality criteria for particular water bodies that will protect designated uses of the water.

20. The Administrator of EPA authorized WVDEP, pursuant to Section 402(a)(2) of the Act, 33 U.S.C. § 1342(a)(2), to issue NPDES permits on May 10, 1981.  47 Fed. Reg. 22363. The applicable West Virginia law for issuing NPDES permits is the Water Pollution Control Act ("WPCA"), W.Va. Code § 22-11-1, et seq.

21. Section 505(a) of the CWA, 33 U.S.C. § 1365(a) authorizes any "citizen" to "commence a civil action on his own behalf. . . against any person. . . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter."

22. Section 505(f) of the CWA, 33 U.S.C. § 1365(f) defines an "effluent standard or limitation under this chapter," for purposes of the citizen suit provision in Section 505(a) of the CWA, 33 U.S.C. § 1365(a), to mean, among other things, an unlawful act under Section 301(a)

5

of the CWA, 33 U.S.C. § 1311(a) and/or "a permit or condition thereof" issued under Section 402 of the CWA, 33 U.S.C. § 1342(a).

23. In any action brought under Section 505(a) of the CWA, 33 U.S.C. § 1365(a), the district court has jurisdiction to order the defendant to comply with the CWA.

24. Under Section 505(d) of the CWA, 33 U.S.C. § 1365(d), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such an award is appropriate."

25. Section 506 of SMCRA, 30 U.S.C. § 1256, prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from OSMRE or from an approved state regulatory authority.

26. At all relevant times, the State of West Virginia has administered an approved surface mining regulatory program under SMCRA. *See* 30 C.F.R. § 948.10.

27. Among the performance standards mandated by SMCRA and the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA") is that "[d]ischarges of water from areas disturbed by . . . mining activities shall be made in compliance with all applicable State and Federal water quality laws and regulations. . . " 30 C.F.R. § 817.42; *see also,* W.Va. C.S.R. § 38-2-14.5.b.

28. Performance standards further require that "[a]ll surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside the permit area." W.Va. C.S.R. § 2-14.5. At minimum, "material damage" includes violations of applicable water quality standards.

29.     The legislative rules promulgated under WVSCMRA provide that, as a general condition of all surface mining permit issued under the WVSCMRA, the permittee must comply with all applicable performance standards. W.Va. C.S.R. § 38-2-3.33.c.

30.     Section 520(a) of SMCRA, 30 U.S.C. § 1270(a) authorizes any person adversely affected to bring an action in federal court to compel compliance with SMCRA against any "person who is alleged to be in violation of any rule, regulation, or permit issued pursuant to [SMCRA]."

31.     Section 520(d) of SMCRA, 30 U.S.C. § 1270(d), authorizes the Court to award the costs of litigation, including attorney fees and expert witness fees, "to any party, whenever the court determines such an award is appropriate."

32.     WVDEP is the agency in the State of West Virginia that administers the State's CWA and SMCRA programs and issues WV/NPDES permits and WVSCMRA permits.

**FACTS**

33.     Dana's mining operations at the 140-acre Prime #1 Deep Mine are regulated pursuant to West Virginia Mining Permit U025100. The WVDEP transferred this permit to Dana on August 1, 2008. It was most recently renewed on May 23, 2018 and remains in effect.

34.     Discharges from the Prime #1 Deep mine are regulated pursuant to WV/NPDES permit WV1011715. The WVDEP transferred this permit to Dana on August 19, 2008. It was most recently renewed on July 10, 2018 and remains in effect.

35.     Part C of Dana's WV/NPDES permit incorporates by reference W.Va. C.S.R. § 47-30-5.1.f, which provides that: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of the applicable water quality standards adopted by the Department of Environmental Protection, Title 47 Series 2." WVDEP's narrative

water quality standards prohibit discharges of "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or that cause "significant adverse impacts to the chemical, physical, hydrologic, or biological components of aquatic ecosystems." W.Va. C.S.R. §§ 47-2-3.2.e & 2.3.2.i.

### Violations of Water Quality Standards at Dana's Prime #1 Deep Mine

36. Permit WV1011715 regulates discharges from Outlet 004 at the Prime #1 Deep Mine.

37. Outlet 004 serves as the outlet for the Bowlby Mills Impoundment. This structure controls stormwater runoff from the surrounding existing forestland and reclaimed disturbed area as well as pumped discharges from the Prime #1 Mine and Christopher No. 2 Mine. Outlet 004 discharges into an unnamed tributary of Robinson Run at Mile Point 4.09. Robinson Run flows southeast into the Monongahela River.

38. On April 14, 2010, WVDEP measured the WVSCI score in the unnamed tributary of Robinson Run and found it to be 22.49. That measurement indicates the stream was severely biologically impaired. The score was influenced by the discharges from Outlet 004 because those discharges have occurred in substantially the same way since prior to that date. In its 2016 Section 303(d) report, WVDEP listed the passing WVSCI score as 72. In its 2014 TMDL report for the Monongahela River watersheds, WVDEP listed ionic stress as the significant stressor for the unnamed tributary of Robinson Run at Mile Point 4.09.

39. In its 2016 Section 303(d) report, WVDEP also listed Robinson Run as biologically impaired along its entire length. The most recent WVSCI score recorded by the WVDEP in Robinson Run was 38.27, well below the threshold for a passing. An assessment using the Genus Level Index of Most Probable Stream Status (GLIMPSS) was conducted in

8

January of 2017.  That assessment demonstrated continued impairment.  In its 2014 TMDL Report for the Monongahela River watersheds, WVDEP listed ionic stress as a significant stressor for Robinson Run.

40. Dana's discharge monitoring reports since July 2018 show that it discharged the following average pH, average flow (in gpm) and average amounts of specific conductance (Cond), sulfates ($SO_4$), chlorides (Cl), and total dissolved solids (TDS) from Outlet 004:

|  | Outlet 004 | | | | |
|---|---|---|---|---|---|
|  | Cond | pH | $SO_4$ | TDS | Flow |
| Jul-18 | 3225 | 7.85 | 1695 | 2621 | 337 |
| Aug-18 | 3420 | 7.65 | 1640 | 2964 | 2399 |
| Sep-18 | 3415 | 7.65 | 1660 | 2878 | 1100 |
| Oct-18 | 3430 | 7.5 | 1800 | 2970 | 1750 |
| Nov-18 | 3425 | 7.5 | 1850 | 2986 | 1100 |
| Dec-18 | 3340 | 7.75 | 1815 | 2876 | 1750 |
| Jan-19 | 3240 | 7.9 | 1688 | 2728 | 2400 |
| Feb-19 | 3275 | 7.9 | 1666 | 2628 | 2400 |
| Mar-19 | 3205 | 7.95 | 1730 | 2736 | 1750 |
| Apr-19 | 3240 | 8 | 1727 | 2832 | 1750 |
| May-19 | 3250 | 7.75 | 1735 | 2816 | 1100 |
| Jun-19 | 3225 | 7.85 | 2265 | 2840 | 1150 |

41. As a result of these high-flow, high-conductivity discharges from Outlet 004, there is a large difference in the average conductivity and sulfate in Robinson Run upstream (station UUR-3) and downstream (station DDR-4) of the point where the unnamed tributary carrying that outlet's discharges enters Robinson Run—as shown in the following table:

9

|        | Cond in RR at UUR-3 | Cond in RR at DRR-4 | Sulfate in RR at UUR-3 | Sulfate in RR at DRR-4 |
|--------|---------------------|---------------------|------------------------|------------------------|
| Jul-18 | 969                 | 2755                | 322                    | 1275                   |
| Aug-18 | 973                 | 3375                | 389                    | 1570                   |
| Sep-18 | 835                 | 3110                | 243                    | 1370                   |
| Oct-18 | 904                 | 3310                | 298                    | 1670                   |
| Nov-18 | 693                 | 2985                | 230                    | 1575                   |
| Dec-18 | 739                 | 3045                | 249                    | 1575                   |
| Jan-19 | 720                 | 3075                | 263                    | 1600                   |
| Feb-19 | 500                 | 2650                | 163                    | 1163                   |
| Mar-19 | 731                 | 2945                | 205                    | 1545                   |
| Apr-19 | 630                 | 2900                | 213                    | 1527                   |
| May-19 | 694                 | 2830                | 229                    | 1505                   |
| Jun-19 | 816                 | 3055                | 436                    | 2110                   |

42.     High levels of conductivity, dissolved solids, alkalinity and ionic chemicals (including sulfates, bicarbonate, magnesium and calcium) are a primary cause of water quality impairments downstream from mine discharges.

43.     In 2011, EPA scientists summarized the existing science connecting conductivity and biological degradation in an EPA report entitled, "A Field-Based Aquatic Life Benchmark for Conductivity in Central Appalachian Streams." That report, which was peer-reviewed by scientists on EPA's Science Advisory Board, used EPA's standard method for deriving water quality criteria to derive a conductivity benchmark of 300 μS/cm. *Id*. at xiv-xv.  According to the species sensitivity distribution in the benchmark, on average, five percent of species are lost when conductivity rises to 295 μS/cm, over 50% are lost at 2000 μS/cm, and close to 60% are lost at 3000 μS/cm. *Id*. at 18.

10

44. EPA considered potential confounding factors, including habitat, temperature, deposited sediments and pH, and concluded that none of them altered the relationship between conductivity and biological decline or the benchmark value of 300 µS/cm. *Id. at* 41, B-22. EPA found that the loss of aquatic species from increased conductivity was "a severe and clear effect." *Id*. at A-37. EPA also conducted a detailed causal assessment and concluded that there is a causal relationship between conductivity and stream impairment in West Virginia. *Id*. at A-39. Finally, EPA's benchmark report analyzed the relationship between the WVSCI biological impairment threshold and conductivity levels, and found that a WVSCI score of 64 (close to the impairment threshold of 68) corresponds to streams with conductivity of about 300 µS/cm on average. *Id*. at A-36. A statistical analysis included in the benchmark determined that at a conductivity level of 300 µS/cm a stream has a 59% likelihood of being impaired and at 500 µS/cm a stream has a 72% likelihood of being impaired. *Id*. at A-36.

45. A 2016 study by Clements and Kotalik using simulated mine effluents in an experimental stream under controlled conditions measured the same adverse effects on aquatic organisms at conductivity levels of 300 µS/cm and lower.

46. Highly conductive leachate from surface mines in Appalachia results from the weathering of pyritic material, which interacts with regional geology to form an alkaline mixture dominated by sulfate ($SO_4$), bicarbonate ($HCO_3$), magnesium (Mg) and calcium (Ca). This alkaline mine drainage can be characterized by high levels of sulfates, increased pH and high ionic strength.

47. The drainage coming from Outlet 004 at the Prime #1 Deep Mine is dominated by sulfates and is both high in ionic strength and alkaline. Although publicly available permit records for the discharge at Outlet 004 contains no measurements of bicarbonate, magnesium, or

11

calcium levels, it can be inferred from the existing literature on alkaline mine drainage that those ions are likely to be present in the discharge.

48. The ionic mixture of such drainage is known to cause the loss of aquatic macroinvertebrates in Appalachian areas where surface coal mining is prevalent and ultimately the biological impairment of the receiving stream. The high concentration of ionic pollutants in alkaline mine drainage also has significant adverse effects on fish assemblages and has toxic effects on aquatic life, including mayflies.

49. The EPA Benchmark report is supported by peer-reviewed studies, including a study by Bernhardt, et al., titled "How Many Mountains Can We Mine? Assessing the Regional Degradation of Central Appalachian Rivers by Surface Coal Mining," Environmental Science & Technology, 46 (15), pp. 8115–8122 (2012).  That study's authors found that:

> The extent of surface mining within catchments is highly correlated with the ionic strength and sulfate concentrations of receiving streams.  Generalized additive models were used to estimate the amount of watershed mining, stream ionic strength, or sulfate concentrations beyond which biological impairment (based on state biocriteria) is likely.  We find this threshold is reached once surface coal mines occupy >5.4% of their contributing watershed area, ionic strength exceeds 308 μS cm$^{-1}$, or sulfate concentrations exceed 50 mg/L.

50. Dana's Prime #1 Deep Mine is a major development activity affecting the Robinson Run watershed.  The discharges from Outlet 004 have likely caused or materially contributed to biological impairment in the unnamed tributary to Robinson Run and in the downstream section of Robinson Run.

### FIRST CLAIM FOR RELIEF
### (CWA § 402 Permit Violations)

51. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 50 above.

52. Since at least July 2018, Dana has discharged and continues to discharge pollutants from a point source, i.e. Outlet 004, at its Prime #1 Deep Mine into an unnamed tributary at Mile Point 4.09 of Robinson Run pursuant to WV/NPDES Permit WV1011715.

53. Robinson Creek and the unnamed tributary at Mile Point 4.09 are waters of the United States within the meaning of 33 U.S.C. § 1362(7).

54. Since at least July 2018, Dana has discharged and continues to discharge pollutants which cause ionic stress and biological impairment into Robinson Run and its unnamed tributary at Mile Point 4.09 in violation of the narrative water quality standards for biological integrity and aquatic life protection. W.Va. C.S.R. §§ 2-3.2.3 & 2.3.2.i.

55. The narrative water quality standards for biological integrity and aquatic life protection incorporated by reference into Part C of Lexington's WV/NPDES Permit WV1011715 are "effluent standards or limitations" for purposes of Section 505(a)(1) and 505(f)(6) of the Clean Water Act because they are a condition of a permit issued under Section 402 of the Act.  33 U.S.C. §§ 1342, 1365(a)(1), 1365(f)(6).

56. Based on the WVSCI scores and measured concentrations of ionic pollutants and specific conductivity in Dana's discharges, and Dana's failure to take corrective actions to address those conditions, Plaintiffs believe and allege that Dana is in continuing and/or intermittent violation of permit WV1011715.

**SECOND CLAIM FOR RELIEF**
**(SMCRA VIOLATION)**

57. Plaintiffs incorporate by reference all allegations contained in paragraphs 1 through 56 above.

58. Dana's WVSCMRA permit U025100 requires it to comply with performance standards of the WVSCMRA.  W.Va. C.S.R. § 2-3.33(c).

13

59. Those performance standard provide that "[d]ischarges of water from areas disturbed by . . . mining activities shall be made in compliance with all applicable State and Federal water quality laws and regulations. . ." 30 C.F.R. § 817.42; *see also*, W.Va. C.S.R. § 38-2-14.5.b.

60. West Virginia water quality standards prohibit discharges of "[m]aterials in concentrations which are harmful, hazardous or toxic to man, animal or aquatic life" or that cause "significant adverse impacts to the chemical, physical, hydrologic, or biological components of aquatic ecosystems." 47 C.S.R. § 2-3.2.e.

61. West Virginia water quality standards also prohibit discharges of "[m]aterials in concentrations which are harmful, hazardous, or toxic to man, animal or aquatic life" or that cause "significant adverse impacts to the chemical, physical, hydrologic, or biological components of aquatic ecosystems."  47 C.S.R § 2-3.2.i.

62. WVSCMRA performance standards further provide that "[a]ll surface mining and reclamation activities shall be conducted . . . to prevent material damage to the hydrologic balance outside of the permit area."  38 U.S.C. § 2-14.5.  "Material damage," at a minimum includes violations of water quality standards.

63. By violating NPDES permit effluent limitations and West Virginia water quality standards for biological integrity and aquatic life protection at its Prime #1 Deep Mine, Lexington has also violated and is continuing to violate the performance standards incorporated into its WVSCMRA Permit U025100.

64. Federal and State performance standards also require that "[i]f drainage control, restabilization, and revegetation of disturbed areas, diversion of runoff, mulching, or other reclamation and remedial practices are not adequate to meet this section and the requirements of

§ 817.42, the operator shall use and maintain the necessary water-treatment facilities or water quality controls." 30 C.F.R. § 817.41(d)(1); *see also*, W.Va. C.S.R. § 38-2-14.5.c ("Adequate facilities shall be installed, operated and maintained using the best technology currently available in accordance with the approved preplan to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b. of this subsection.").

65. The violations herein show that Dana's existing treatment methods are insufficient to meet that requirement. Thus, the performance standards require Dana to construct a system that will effectively treat its effluent to levels that comply with all applicable effluent limitations and water quality standards.

66. Each violation of Dana's WVSCMRA permits is a violation of SMCRA and is enforceable under the citizen suit provision of SMCRA, 30 U.S.C. § 1270(a).

67. Dana is subject to an injunction under SMCRA ordering it to cease its permit violations.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court enter an Order:

1. Declaring that Dana has violated and is in continuing and/or intermittent violation of the CWA and SMCRA;

2. Enjoining Dana from operating its Prime #1 Deep mine in such a manner as will result in further violations of WV/NPDES Permit WV1011715 and WVSCMRA permit U025100;

3. Ordering Dana to immediately comply with effluent limitations in WV/NPDES permit WV1011715;

15

4. Ordering Dana to immediately comply with the terms and conditions of WVSCMRA permit U025100;

5. Ordering Dana to conduct monitoring and sampling to determine the environmental effects of its violations, to remedy and repair environmental contamination and/or degradation caused by its violations, and restore the environment to its prior uncontaminated condition;

6. Awarding Plaintiffs their attorney and expert witness fees and all other reasonable expenses incurred in pursuit of this action; and,

7. Granting other such relief as the Court deems just and proper.

Respectfully submitted,

/s/ J. Michael Becher
J. Michael Becher (WV Bar No. 10588)
Derek Teaney (WV Bar No. 10223)
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 382-4798
mbecher@appalmad.org
dteaney@appalmad.org

Counsel for Plaintiffs